THE LAW OFFICE OF RICHARD G.
CAMPBELL, JR. INC.
RICHARD G. CAMPBELL, JR. (Bar No. 1832)
200 S. Virginia Street, 8th Floor
Reno, NV  89501
Telephone: (775) 686-2446
Facsimile: (775) 686-2401
rcampbell@rgclawoffice.com

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEVADA

IMC INVESTMENT GROUP CNR, LLC,
a Nevada limited liability company,

    Plaintiff,

v.

ROBERT RADOVAN, WILLIAM CRISWELL, BRANDYN IVERSON, CRISWELL RADOVAN, LLC, a Nevada limited liability company; CR Cal Neva, LLC, a Nevada limited liability company; and POWELL, COLEMAN and ARNOLD LLP,

    Defendants.

CASE NO.

## COMPLAINT

Plaintiff IMC INVESTMENT GROUP CNR, LLC ("IMC"), by and through its undersigned counsel and hereby complains against the Defendants, ROBERT RADOVAN; WILLIAM CRISWELL; BRANDYN IVERSON; CRISWELL RADOVAN, LLC, a Nevada limited liability company; CR Cal Neva, LLC, a Nevada limited liability company; and POWELL, COLEMAN and ARNOLD LLP.

## PARTIES

1. Plaintiff IMC INVESTMENT GROUP CNR, LLC, is a Nevada limited liability company.

1

COMPLAINT

2. Defendant ROBERT RADOVAN ("Radovan") is an individual residing, upon information and belief, at 3509 Evey Road, Calistoga, California, and doing business in Nevada both individually and through various entities, including Defendants.

3. Defendant WILLIAM CRISWELL ("Criswell") is an individual residing, upon information and belief, at 42904 Calle Roble, Murrieta, California, and doing business in Nevada both individually and through various entities, including Defendants.

4. Defendant BRANDYN INVERSON ("Iverson") is an individual residing, upon information and belief, at 58 Hacienda Circle, Orinda, California and formerly Vice President, and upon information and belief, has an ownership interest in Criswell Radovan, LLC and CR Cal Neva, LLC.

5. Defendant CRISWELL RADOVAN, LLC ("Criswell Radovan") is a Nevada limited liability company, upon information and belief, located at 1336 Oak Avenue, #D, St. Helena, California and whose managers and owners are Sharon Criswell, William Criswell, Brandyn Iverson, Robert Radovan, and owners of CR Cal Neva, LLC.

6. Defendant CR Cal Neva, LLC ("CR") is a Nevada limited liability company, upon information and belief, is located at 1336 Oak Avenue, #D, St. Helena, California and whose managing member is William Criswell, and upon information and belief is owned by William Criswell, Robert Radovan, Brandyn Iverson and/or Criswell Radovan.

7. Defendant POWELL, COLEMAN and ARNOLD LLP ("Powell Coleman") is a law firm, upon information and belief, located at 8080 N. Central Expressway, Suite 1380 Dallas, Texas and who has and continues to represent Criswell, Radovan, Iverson, Criswell Radovan, CR and Cal Neva Lodge, LLC as to the financing and development of the Cal Neva Lodge located in Nevada and California (as referred herein, the "Cal Neva Lodge," or "Project").

## JURISDICTION and VENUE

8. Jurisdiction lies with this Court under 18 U.S.C. Section 1961, 18 U.S.C. Section 1962 and 18 U.S.C. Section 1964. Venue is proper in this District under 18 U.S.C. Section 1965 in that the actions of the Defendants herein, and the transaction of their affairs as alleged below, took place primarily at Crystal Bay, Nevada and Incline Village, Nevada. Jurisdiction for Plaintiff's

2

COMPLAINT

state law claims is proper under 28 U.S.C. Section 1367.

## FACTS COMMON TO ALL CAUSES OF ACTION

9. Radovan, Criswell and Iverson are real estate developers who in 2013 purchased the Cal Neva Lodge. In order to fund the redevelopment of the lodge and to pay off the note that the sellers took when they sold the property, Radovan, Criswell and Iverson prepared a Private Placement Memorandum ("PPM") where they sought to raise $18 million from equity investors. They also formed a Nevada LLC to operate and manage the redevelopment, CR Cal Neva, LLC, which upon information and belief, is owned by Criswell, Radovan and Iverson They also formed Cal Neva Lodge LLC, which is the legal entity where the investors money went into and which was the entity that developed and was to manage the property once completed

10. As represented in the PPM, The Cal Neva Lodge was founded in 1926. It is the oldest casino in the U.S. and the lodge saw its heyday in the 1960s when it was owned by Frank Sinatra and members of organized crime and became a popular destination among the Hollywood and political elite. The Property features 191 guest rooms among its tower, chalets, and cabins. It also enjoys a non-restricted gaming license for a 17,000 square foot casino. Radovan, Criswell, Iverson and their agent, Dave Marriner ("Marriner"), both written and orally confirmed, that due to the very good structural and "back of house" condition of the property, the lodge could be renovated and re-opened for about $32 million renovation cost, with about 12 months for the upgrade. Radovan, Criswell and Marriner touted the team's long and proven record of accomplishments in the luxury hotel space, including several significant historic rehabilitations. They claimed the Ritz Carlton in San Francisco and the Aetna Springs project in Napa Valley (currently an abandoned development) showed Radovan, Criswell and Iverson's understanding of both the creative sensitivity in planning as well as the marketing power of restoring these historic hotels. Criswell, Radovan and Marriner bragged about the work on the Calistoga Ranch project in Napa Valley (ranked #1 hotel in California and #5 in the U.S. by U.S. News and World Report) in addition to those other properties, demonstrated their success and expertise in developing one-of-a-kind properties in markets with very high barriers to entry. Upon information and belief these projects were not successful under Criswell, Iverson and Radovan's management, and in many

cases, they had limited or no involvement or were pushed out of the projects for poor management.

11. The Defendants claimed the Project would initially be capitalized with $20 million of equity and $35 million of debt. The $29 million senior loan was to be interest only at 9% for the first three (3) years, and an amortizing mini-perm for two (2) additional years if needed. Assuming the hotel could be refinanced in 2017, the property should repay both the investors' equity and the construction loan with a $60 million permanent loan. That loan would be supported by a healthy coverage ratio of 1.4x from the first years of operation. Radovan, Criswell and Iverson made numerous representations in writing and orally, and in the accompanying PPM, Offering Memorandum and Operating Agreement, as to their success and expertise as a team and developers on other projects around the world, the accuracy of their budgets for the renovation of the Cal Neva Lodge, the ability to manage a project of this scale and manage the use of funds to be raised under the PPM and the timing and expected profits to accrue to the investors. All of these representations were purposely misrepresented, untrue and designed to induce the investors into investing under the PPM.

12. Despite representations by Criswell, Radovan and Iverson that a broker would not be used to raise the equity needed for the Project, on or about February 2014, Marriner entered into a consulting agreement with the Cal Neva Lodge LLC, whereby Marriner would assist in the marketing and sale of the memberships under the PPM for a three percent commission. This agreement was not disclosed, or the fees paid to Marriner, to investors or the executive committee. Under the Agreement, Marriner "will manage all aspects of the sales of 5 founding Memberships and 28 condominiums approved on the site plan." Marriner ended up raising $15 million under the PPM and was paid approximately $495,000, as well as membership interest in the Project, which reduced that capital available to develop the project.

13. Starting in 2014, defendants Criswell and Radovan along with their agent Marriner, approached members of the IMC to sell them on the investment into the Cal Neva Lodge. Numerous meetings, conference calls, property tours, oral discussions and representations were made, including and not limited to, that Criswell, Iverson and Radovan had done extensive investigation of the cost to refurbish the Project and that the proposed Construction Budget had

been vetted and was iron clad. Furthermore, a fixed fee contract with the general contractor, Penta, would eliminate the possibility of cost overruns and delays in opening the hotel and casino. The Defendants also represented that Criswell, Iverson and Radovan had very successful records of accomplishments in developing and managing other like projects and no stone was unturned to ensure an on-time and on-budget project. Finally, Criswell, Iverson and Radovan represented only $14 million was actually needed in equity to complete the Project and an additional $6 million to fully subscribe the $20 million outlined in the PPM would provide a "cushion" for the Project.

14. Based on the representations of the Defendants and the specific representations in the PPM and associated documents, IMC made a $6 million investment under the PPM, on or about August 26, 2014 and became the single largest investor in the Project and earning a seat on the executive committee.

15. Once IMC invested in the PPM, an Amended and Restated Operating Agreement, which was drafted by Powell Coleman, was sent to the various investors under the PPM for signautres.. The Operating Agreement governed the terms of the relationship between the members and approved CR Cal Neva LLC, an entity owned by Criswell and Radovan, to be the contracted Manager of the LLC and entered in a Development Service Contract which was to be negotiated by a third attorney to avoid any conflict of interest – which it was not.

16. The Operating Agreement drafted by Powell Coleman also set forth that of the $20 million authorized under the PPM, CR Cal Neva would be credited with a $2 million investment for what was claimed as funds that Criswell and Radovan had advanced to the Project. It was very important to IMC and its members so that Criswell and Radovan had "skin in the game."

17. On or about September 30, 2014, Cal Neva Lodge LLC entered into a loan transaction with Hall whereby Hall would fund the construction of the Project for $29 million. Shortly thereafter, a non-fixed fee construction contract, contrary to the representation about a fixed fee contract, was entered into with Penta to be the prime contractor on the Project.

18. In the spring of 2015, IMC became very concerned due to the lack of information and communication being provided by Radovan, Criswell, Criswell Radovan and CR. Executive committee meetings to update the investors were supposed to occur monthly during the

construction phase of the Project and were not happening or scheduled and pushed off. After finally getting an investor update meeting to occur at the Fairwinds Estate lakefront property on or about February 2015, Criswell and Radovan made repeated representations that the project was on budget and on schedule to be substantially complete and open by December 2015.

19. Despite having an obligation under the Operating Agreement, CR, Criswell Radovan, Radovan and Criswell failed to provide meaningful and accurate updates and reports on the status of the Project and kept its members and the executive committee in the dark.

20. In July of 2015, change orders and potential upgrades to the construction contract with Penta were approaching $5 million and CR, Criswell and Radovan represented that they would refinance the Mezzanine Loan on the project with a new loan in the amount of $15 million. The executive committee of the Cal Neva Lodge was told that the additional funds above and beyond the $6 million plus accrued interest due under the Mezzanine note would be used to pay for change orders that had accrued due to construction and zoning issues, contemplated upgrades to the Project, to start development of the 28 condominiums located at the site and to use the rest of the funds as a cushion for other potential expenses. Although these items were discussed at a cursory level with the executive committee in an informal setting, no detailed information was provided as to the impact to the budget to complete the Project or timing to complete. Upon information and belief, at or about the same time, the CR Defendants knew that the change orders approved and in the pipeline for approval would be approximately $10 million or more and either additional equity or debt would be needed to complete the project.

21. By August or September 2015, the CR Defendants had not obtained a refinance of the Mezzanine Loan and instead looked to refinance the entire Project seeking an additional $15 million in debt. Without a new refinance, the Project was not going to be able to be completed due to $11 million or more in change orders from the contractor – an increase of approximately 60 percent above the original construction budget – as well as other costs not included in the original budget. Without an additional $15 million, the project would never be completed.

22. Starting in July of 2015, the CR Defendants were notified, that under the loan agreement with Hall, the loan was out of balance and needed $1.4 million in equity so that Hall

would continue to release funds.

23. At the same time, Criswell, Radovan, and CR were seeking a $1 million investment under the terms of the PPM from Stuart Yount, a resident of Crystal Bay, Nevada. However, Stuart Yount's ("Mr. Yount") investment had not been consummated by mid September, and with the looming threat of Hall's cutting off funding for the construction of the Project and Penta walking off the job, Criswell and Radovan s obtained a $1.5 million investment from Les Busick, an existing member of the LLC that had already invested $1 million.

24. As a condition to Les Busick's additional investment, Mr. Busick was promised additional membership interest in the Project from CR, Criswell and Radovan's interest and other perks at the expense of the other investors in Project. This was never approved or disclosed to the investors or executive committee. Furthermor,e and by request of Les Busick, CR, Criswell and Radovan agreed not to pay themselves the $60,000 per month of management fees that had accrued or would accrue going forward until the project was back on track or completed.

25. Even though the PPM was fully allocated and could not raise any more funds, Criswell, Radovan, CR and Powell Coleman continued with Mr. Yount's investment having him sign all of the documents as if he was a PPM investor. Knowing the project was in serious trouble and CR, Criswell and Radovan could not take out money under the Operating Agreement without other members' approval, CR, Radovan and Criswell devised a plan to instead "sell" one of their shares to Mr. Yount without telling him or the investors or executive committee and without getting Mr. Yount to agree to it. Criswell and Radovan took the $1 million for themselves and paid Marriner $30,000 in fees and never told the other members what they had done. The Yount money was then dispersed partly to Iverson and, upon information and belief, the rest went to Criswell and Radovan for personal use.

26. Prior to obtaining Mr. Yount's $1 million, Criswell and Radovan told their counsel, Powell Coleman, that they had an additional investor who will take the place of one of the CR's purported $2 million investment in the Project. Coleman responded back to CR stating that he needed to make them aware that if CR was selling one of their shares, the Operating Agreement required that they get written approval of 67% of the other investors approving such transfer. IMC

would have never approved such a sale because having Criswell and Radovan "skin-in-the-game" was an important and critical deal point to help induce their investment in the Project. Additionally, it would send a very bad signal to lenders and investors that the "Captain of the Ship" was running for the life boats in front of their passengers. Coleman alleges that he was told by Criswell and Radovan that they had such approval, and then without any further due diligence, once he received Mr. Yount's $1 million into his trust account, transferred the $1 million to Criswell Radovan. None of the other investors were told of this transaction and no written approval was ever discussed or obtained from members holding 67% interest in the LLC as required under the Operating Agreement.

27. By October 2015, IMC was deeply concerned with Criswell and Radovan's management performance and breaches to the Operating Agreement. IMC called a meeting with Radovan and outlined its concerns in a letter. Radovan admitted they had breached the Operating Agreement and promised to "turn-over-a-new-leaf" and provide timely financial information, schedule monthly executive committee meetings to update investors and look out for the best interest of the Project and its investors. These words proved to be continued lies and "lip service".

28. In October and November 2015, IMC demanded to see the unaudited monthly financial statements for 2015, a detailed analysis of the cost overruns and the 2014 audited financials, that it never received and were required under the Operating Agreement. Radovan represented all of these documents were readily available and he would provide them immediately. After an additional two weeks past and nothing was provided by Radovan, IMC sent another breach letter to Criswell and Radovan and gave them notice its desire to hire a third party forensic accounting firm to review the books and records. Radovan had misrepresented that the 2014 audit was complete. The financial records were in such a complete disarray that providing monthly financial statements for 2015 and an intelligent analysis of the cost overruns and the impact to the Project's profitability and time to complete was virtually impossible.

29. In October 2015, a refinance of the Mezzanine loan had not been obtained, and with change orders now approaching over $10 million, Radovan and Criswell started negotiations with Mosaic Real Estate, a lender from southern California.

30.     On or about October 22, 2015, Mosaic sent Radovan a term sheet to outline the proposed terms of the loan. The loan proposal was for $46 million with an option to fund up to $55 million based on an appraisal. The loan proceeds would be used to pay off the Hall loan balance of approximately $19.5 million, for loan fees, costs and reserves, and $20,324,880 to finish construction on the project.

31.     On or about November 7, 2015 at an executive committee meeting, executive committee members Brandon Chaney, Paul Jameson, Les Busick and proxy Phil Busick directed that Radovan and Criswell push forward with due diligence with Mosaic but to also inquire as to other loan sources to insure that there were options to evaluate in a detailed financial forecast and plan. The executive committee was concerned because Radovan had signed a term sheet with Mosaic without executive committee approval that appeared to commit the Project to a breakup fee with no commitment to fund anything at all. Radovan assured the executive committee this was not the case. Due to the Criswell and Radovan's lack of transparency, the executive committee had no ability to even evaluate if the Mosaic loan would be sufficient to complete the Project or to analyze the financial impact of the new debt service to the overall budget.

32.     Although very interested in the Project as a whole, Mosaic was very frustrated with Criswell and Radovan's disorganization and began to seriously questioned their ability to the manage the Project. In late January after not being contacted by Criswell or Radovan, Mosaic reached out to the executive committee through one of their due diligence agents to coordinate a meeting with the three members of the executive committee, not including Criswell or Radovan, to discuss the loan and a potential path forward as they held a signed term sheet binding the company to a $ 1 million breakup fee. The meeting took place on or about February 1, 2016. Mosaic informed the executive committee members that it had not heard from Radovan or Criswell and that it was not interested in proceeding with a loan if CR, Criswell and Radovan was going to continue as managers of the Project.

33.     The pressure put on Criswell and Radovan by the IMC and executive committee initiated the scheduling of an all hands investor update in January 2016 at the Hyatt Regency Resort in Incline Village in Lake Tahoe. During this meeting, the investors publicly vented and

communicated their complete dissatisfaction with Criswell, Radovan and CR's gross mismanagement and incompetence with the Project, and in an open forum with investors, they were asked to step down as Managers. Criswell, Radovan and CR refused to step down or consider selling the real estate to try to recoup the money invested by the membership. On or about January 2016, Plaintiffs and other investors started investigating the representations made by Defendants and later discovered that most, if not all representations about the Project, their qualifications, record of accomplishments and experience were not true or grossly exaggerated.

34. During December 2015 through May 2016, despite repeated requests from executive committee members and other members for Criswell and Radovan to remove themselves from the Project, they refused and the result was no new investors stepped forward to refinance or invest in the Project. To add insult to injury, Mr. Yount sued CR, Criswell, Radovan and Criswell Radovan and the Project in April of 2016 further eroding any chance a financial institution or new investors would ever invest in the Project with Criswell and Radovan at the helm. Despite all of this, Criswell and Radovan continued to defy and ignore requests and demands from the investors to step aside.

35. In June of 2016, with Hall and Ladera, the two lenders on the project, threatening to foreclose due to lack of payment, both Cal Neva Lodge, LLC and its wholly owned subsidiary, New Cal Neva Lodge, LLC, filed a chapter 11 bankruptcy. These filings were done without membership knowledge or executive committee involvement or approval.

36. The executive committee and IMC urged Criswell and Radovan to step aside again after the bankruptcy filing so the investors could lead an organized sale of the Property to recoup their equity investments. Upon information and belief qualified buyers or investors were concerned about Criswell and Radovan's continued involvement in the project, similar to Mosaic. The Defendants demanded to stay in control and push for a refinance instead of a sale as they claimed a sale would only result in a poor outcome due to the distressed nature of the Project. After finally agreeing to retain CBRE as a broker to market the Property in parallel to a refinance, CR, Criswell and Radovan scared away potential buyers brought to the table by the broker and investors as they wanted to stay in control and finish the construction of the Project to earn more development fees. The non-disclosure agreement given to prospective buyers required that Criswell Radovan

continued involvement as a condition of having access to due diligence materials. On September 14, 2017, the Bankruptcy Court held an auction for purchase of the property out of Bankruptcy and entered an order approving the sale to Lawrence Investments for $38 million. That money will go to partially pay off the loans on the Property and for partial payments to the contractor and subcontractors. All of the equity in the Property, including the Plaintiff's $6 million investment, has been wiped out.

## FIRST CAUSE OF ACTION
### RACKETEER INFLUENCED AND CORRUPT ORGANIZATION ACT (RICO) UNDER 18 USC Sections 1961 et seq. AGAINST ROBERT RADOVAN, WILLIAM CRISWELL, BRANDYN IVERSON

37. Plaintiff realleges and incorporates by this reference, as set forth in full herein, the allegations in paragraphs 1 through 36 above.

38. Defendants Radovan, Criswell, Iverson, CR and Criswell Radovan all participated in an enterprise intended to defraud and induce investors into the Cal Neva Lodge, LLC by fraudulent representations and material omissions related to the Cal Neva Lodge management, development and ultimate operation as a resort casino.

39. Defendants' actions were of such a nature and number that their actions constituted a pattern of racketeering activity by their fraudulent acts of misrepresentation, securities fraud and material omission of relevant fact intended to induce IMC and other investors to invest in the Project and to keep themselves in control of the Project at the detriment of investors. Upon information and belief, the Defendants never intended to complete the project, rather syphon off as much investor's monies in development fees, commissions and misappropriation of Cal Neva Lodge funds. Those fraudulent acts include but are not limited to presenting a budget that was intentionally doctored to be lower than the actual cost necessary to complete the project all in order to make the numbers work to induce investors; by misrepresenting the successful track record of Criswell, Radovan and Iverson in other projects; by representing that the construction budget and expected work necessary to refurbish the Cal Neva Lodge had been thoroughly vetted; by representing that Criswell and Radovan had infused $2 million of their own cash into the Project in order to obtain a 6.83 percentage of ownership of the LLC; by purchasing the Fairwinds Estate

lake front property which diluted the member's interest and encumbered the project with an additional $4 million in debt; by misrepresenting relationships and agreements with industry connections to induce investors; by purposely stonewalling, lying to and misleading investors to maintain control of the Project to protect their self-dealings; by not disclosing to investors material facts of cost overruns and issues with the Project to protect their position as managers and income streams of and from the Project, by failing to inform investors that prior to the PPM they had pledged investor shares as collateral for the Mezzanine loan, by purposely ignoring and breaching the responsibilities and duties of the Operating Agreement for self gain, and by and taking cash out of the Project without the knowledge and consent of the other members of the LLC including Plaintiff. Defendant's pattern of activity was the direct and proximate cause of Plaintiff's damages in the amount of $6 million and under 18 U.S.C, 1981 et seq., Plaintiff is entitled to treble damages.

## SECOND CAUSE OF ACTION
## BREACH OF CONTRACT AGAINST
## CR CAL NEVA, LLC, ROBERT RADOVAN, WILLIAM CRISWELL AND CRISWELL RADOVAN LLC (COLLECTIVLY THE CR DEFENDANTS)

40. Plaintiff realleges and incorporates by this reference, as set forth in full herein, the allegations in paragraphs 1 through 39 above.

41. Under the Amended and Restated Operating Agreement of the Cal Neva Lodge LLC, CR Cal Neva Lodge was contracted under a Development Services Agreement with the LLC and was obligated to oversee the development of the project.

42. CR Defendants mismanaged the Property, by and through their actions including but not limited to, failing to provide required reporting, failing to turn over books and records, failing to account for millions of dollars, failing to gain approval to sell its shares in the LLC and to Plaintiff's information and belief, taking money out of the Project without member approval or knowledge.

43. Such actions of the CR Defendants were a breach of the Development services agreement, to which all investors were third party beneficiaries, and lead to the Cal Neva Lodge filing bankruptcy and was the proximate cause of the Project to fail thus resulting in Plaintiff's losing its $6 million investment.

## THIRD CAUSE OF ACTION
## BREACH OF FIDUCIARY DUTY AGAINST CR CAL NEVA, WILLIAM CRISWELL, ROBERT RADOVAN, AND BRANDYN IVERSON

44. Plaintiff realleges and incorporates by this reference, as set forth in full herein, the allegations in paragraphs 1 through 43 above.

45. As Manager and agents of the Cal Neva Lodge, and under the terms of the Operating Agreement, the defendants had a fiduciary duty to act in the best interest of the members of the LLC, including Plaintiff. The defendants' actions in mismanaging the Project, concealing and withholding information and purposely creating fraudulent budgets, financials and reports, lying to investors, withholding information from investors and lenders, breaching the Operating Agreement were breaches of that duty.

46. Defendants' actions in mismanaging the project, failing to provide financial records and a failure to communicate and provide sufficient due diligence materials and step down as Managers of the Project with Mosaic caused Mosaic to back out of the loan. But for the actions of CR and Criswell and Radovan, Mosaic would have closed a loan and the Project would have been completed by summer of 2016. Under the Operating Agreement and PPM, if the project had been funded by Mosaic or other lenders, the Plaintiff would have received its $6 million investment back with substantial returns on the investment. Defendants breach of its fiduciary duty and obligations under the Operating Agreement caused Plaintiff damages in the amount of $6 million plus a return on that investment in an amount to be proven at trial.

///

///

## FOURTH CAUSE OF ACTION
## BREACH OF DUTY AGAINST POWELL COLEMAN

47. Plaintiff realleges and incorporates by this reference, as set forth in full herein, the allegations in paragraphs 1 through 46 above.

48. Powell Coleman is the designated escrow holder for investor purchases under the Subscription Agreement for shares of Cal Neva Lodge and was also acting as counsel for the Cal Neva Lodge LLC while also acting as counsel for Criswell and Radovan individually, as well as

their myriad legal entities. As such, Powell Coleman had a duty, fiduciary, statutory or otherwise, (1) to comply with all provisions of the Operating Agreement, including but not limited to, insuring that the CR Defendants, as managers, complied with all requirement in the Operating Agreement.

49. On or about October 14, 2015, Powell Coleman received a wire transfer for $1,000,000 into their trust account from Premier Trust Inc., on behalf of and as custodian of the George Stuart Yount IRA.

50. On October 15, 2015, Powell Coleman negligently distributed and transferred Stuart Yount's $1,000,000 to Criswell Radovan without Stuart Yount's consent and without any documentation evidencing that the $1,000,000 was for a purchase agreement between CR and Mr. Yount and without member's approval as per the Operating Agreement. Such transfer of Mr. Yount's $1,000,000 to Criswell Radovan LLC, which was not even a member of the LLC, was a breach of the duty that Powell Coleman, as an escrow holder and attorney for the Cal Neva Lodge LLC, owed to Plaintiff. That breach of duty, as well as other breaches related to Powell Coleman's actions in failing to insure that the Operating Agreement was followed by their clients, caused damages in excess of $6 million to Plaintiff.

## FIFTH CAUSE OF ACTION
## NEGLIGENCE AGAINST POWELL COLEMAN

51. Plaintiff realleges and incorporates by this reference, as set forth in full herein, the allegations in paragraphs 1 through 50 above.

52. Defendant Powell Coleman had a duty as attorney for the Cal Neva Lodge as well as escrow holder of Mr. Yount's $1 million, to insure that distribution of that amount was done in accordance with the Operating Agreement requiring written approval of 67 percent for the transfer of any members share. Powell Coleman's transfer of those funds to its client, Criswell and Radovan, without any express written authorization from the other members of the LLC, as well as other breaches related to Powell Coleman's actions in failing to insure that the Operating Agreement was followed by their clients, was the proximate cause of Plaintiff's damages that are in excess of $6 million.

## SIXTH CAUSE OF ACTION
## FRAUD IN THE INDUCEMENT AGAINST ROBERT RADOVAN, WILLIAM CRISWELL, BRANDYN IVERSON, CR AND CRISWELL RADOVAN

53. Plaintiff realleges and incorporates by this reference, as set forth in full herein, the allegations in paragraphs 1 through 52 above.

54. Defendants Radovan, Criswell, Iverson, CR, Criswell Radovan knowingly made fraudulent misrepresentations and/or material omissions of fact to Plaintiff intended to induce Plaintiff into contributing $6 million to obtain Founders Units in the Cal Neva Lodge LLC. Such fraudulent misrepresentations include, but are not limited to, that the Cal Neva Lodge would open on or near the end of 2015; that the budget for redevelopment of the hotel, including the construction budget, was well vetted and accurate; that in July 2015 the Project was $4 million to $5 million over budget when in fact the Project was over budget in an amount near $21 million; by representing that Criswell and Radovan had contributed $2 million to the project to gain an ownership interest in the LLC, that the developers had a successful track record of developing similar projects; that the developers would not receive distributions or other payments related to the Project until after the preferred returns and equity investments were paid or returned to the investors; granting Les Busick additional perks and benefits to induce his $1.5 million additional investment at the expense of other investors; by oversubscribing the PPM; that CR would not pay themselves any unpaid management fees of $1.2 million after the Les Busick's additional investment when the project was in desperate need of cash due to their mismanagement. These acts of fraud and others to Plaintiff caused damages in excess of $6 million.

## SEVENTH CAUSE OF ACTION
**PIERCING THE CORPORATE VEIL AGAINST WILLIAM CRISWELL, ROBERT RADOVAN, AND BRANDYN IVERSON**

55. Plaintiff realleges and incorporates by this reference, as set forth in full herein, the allegations in paragraphs 1 through 54 above.

56. The individual Defendants exercised domain and control over CR and Criswell Radovan and there was such unity of interest and ownership that the separation between the legal entities and individuals does not exist.

57. If the actions and omissions of CR and Criswell Radovan are treated solely as actions by only the legal entities, an unequitable result will be occasioned on Plaintiff.

58. As such, the Court should find that the individuals are the alter ego of the legal entities owned by Defendants.

## PRAYER

WHEREFORE, Plaintiff requests the following relief:

1. That Plaintiff be awarded damages in the amount in excess of $6 million;
2. That Plaintiff be awarded treble damages in the amount of $18 million;
3. That Plaintiff be awarded punitive damages as the Court deems appropriate;
4. That Plaintiff be awarded lost profits as the Court deems appropriate;
5. For an award of attorney fees and costs; and,
6. For such other relief as the Court deems necessary.

DATED: September 19, 2017.

THE LAW OFFICE OF RICHARD G. CAMPBELL, JR. INC.

By: /s/ Richard G. Campbell, Jr.
RICHARD G. CAMPBELL, JR.
Attorney for Plaintiff

COMPLAINT

## UNITED STATES DISTRICT COURT

**AFFIRMATION**
**Pursuant to NRS 239B.030**

The undersigned does hereby affirm that the preceding document, filed in this case: **COMPLAINT**;

☒ Document does not contain the social security number of any person

- OR -

☐ Document contains the social security number of a person as required by:

☐ A specific state or federal law, to wit:

_____
(State specific state or federal law)

- or -

☐ For the administration of a public program

- or -

☐ For an application for a federal or state grant

Dated: September 19, 2017.

THE LAW OFFICE OF RICHARD G. CAMPBELL, JR. INC.

By: /s/ Richard G. Campbell, Jr.

17

COMPLAINT

**VERIFICATION**

STATE OF NEVADA      )
                     ) SS.
COUNTY OF WASHOE     )

I, Brandon Chaney, Manager of IMC INVESTMENT GROUP CNR, LLC, being first duly sworn, under penalty of perjury, deposes and says:

I am the Manager of IMC INVESTMENT GROUP CNR, LLC, in the above-entitled action, that I have read the foregoing Complaint and am competent to testify as to the contents of my own knowledge and the contents are true of my own knowledge, except for those matters stated therein on information and believe, and, as to those matters, I believe them to be true.

I declare under penalty of perjury, under the law of the State of Nevada, that the foregoing statements are true and correct.

DATED this ___ day of September, 2017.

IMC INVESTMENT GROUP CNR, LLC

_____
Brandon Chaney, Manager

Subscribed and sworn to before me this 19 day of September, 2017.

_____
Notary Public

DENISE M. MURPHY
Notary Public - State of Nevada
Appointment Recorded in Washoe County
No: 17-3222-2 - Expires August 18, 2021

18
COMPLAINT